James H. Power
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
AMBI SHIPPING PTE LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE HOLWELL

08 CV 3094

---

AMBI SHIPPING PTE LTD.,

      Plaintiff,

-against-

KOREA LINE CORPORATION,

      Defendant.

**VERIFIED
COMPLAINT**

---

Plaintiff, Ambi Shipping Pte Ltd., ("Ambi" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Korea Line Corp. ("KLC" or "Defendant"), alleges, upon information and belief, as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.    At all times material herein, Ambi is and was a business entity organized and existing under the laws of Singapore with its postal business address at 1 Kim Seng Promenade 07-02 Great World City, Singapore 237994, Republic of Singapore.

3.      Upon information and belief, at all times material herein, defendant KLC is and was a business entity organized and existing under the laws of Korea with its principal place of business at Daeil Bldg. #43, Insa-Dong, Chongno-Gu, Seoul, Korea 110-741.

4.      On or about May 19, 2005 Ambi and KLC entered into a time charter party (the "Charter") for the vessel M.V. ALAM MAKMUR.  A true and correct copy of the Charter Party is annexed hereto as Exhibit 1.

5.      The Charter included the standard New York Produce Exchange charter party terms.

6.      Under the terms expressly set out in CLAUSE 8 of the New York Produce Exchange form Charter, ". . . Charterers are to load, stow, secure unsecure, lash, unlash, trim and discharge the cargo at their expense under the supervision and responsibility of the Captain, who, is to sign, or when required by Charterers, authorize Charterers or their Agents to sign Bills of Lading(s) on his behalf for cargo as presented, strictly in conformity with Mate's receipts."

7.      In addition, CLAUSE 41 of the Additional Clauses to the Charter party states, "Owners/Master to authorize Charterers or their agent to sign original Bills of lading if required by Charterers but always in strict conformity with Mate's receipt."

8.      On or about March 30, 2007, a cargo of 282 pieces of steel pipe was loaded onboard the ALAM MAKMUR at a port in Shanghai, China destined for Houston, Texas.

9.      Prior to, during, and/or after loading it was discovered that the cargo was not in good order and condition.  As a result, the Captain of the ALAM MAKMUR issued a "mate's receipt" indicating the nature and extent of the damaged cargo.  A true and correct copy of the "mates receipt" is annexed hereto as Exhibit 2.

10.    Despite the awareness of the damaged condition of the steel pipes, Charterers issued a "clean" bill of lading.    A true and correct copy of Bill of Lading DWLGMALHOU70090 is annexed hereto as Exhibit 3.

11.    Charterer breached CLAUSES 8 and 41 by issuing a "clean" bill of lading despite the written account of known damage to the steel pipe cargo damage reflected in the "mate's receipt."

12.    The cargo was later discharged in Houston, Texas.    At some point in time after discharge, cargo interests sought to recover monetary damages for the damaged steel pipe.    In order to secure the cargo damage claim, which cargo interests alleged to be in the vicinity of $50,000, cargo interests threatened arrest of the ALAM MAKMUR.

13.    In order to avoid costly vessel arrest proceedings and incident delay and interruption of the vessel's service obligations, a Letter of Undertaking from the vessel's P&I Club SKULD was given to cargo interests in exchange for cargo interests agreeing not to arrest the vessel.    A true and correct copy of the Skuld P&I Club Letter of Undertaking is annexed hereto as Exhibit 4.

14.    Subsequent to the issuance of the Letter of Undertaking by Ambi's insurance company (a/k/a P&I Club), owners demanded counter-security from KLC for KLC's breach of the Charter CLAUSES 8 and 41 and for the alleged cargo damage claim by cargo interests.

15.    Ambi sought security from KLC in the amount of $50,000, the same amount which cargo interests demanded from Ambi.    KLC has refused to pay any amount to Ambi for KLC's breach of the Charter.

16.    The Charter is governed by English law, which routinely allows for costs, including a reasonable allowance for attorney's fees. The Charter specifies Singapore arbitration.

17.    Upon information and belief it will take two years to bring this dispute to conclusion, resulting in the following estimated interest and attorneys' fees and costs:

| | | |
|---|---|---|
| Interest: | $      6,000.00 | (2 years at 6% annum from 16 May 2007) |
| Arbitrator's fees | $ 120,000.00 | (Clauses 17 and 38 of the c/p) |
| Attorneys' fees | $   35,000.00 | |
| Total Principal Claim: | $   50,000.00 | |
| Total Sought: | **$  211,000.00** | |

18.    KLC is not found within the Southern District of New York but does have assets, goods or chattels within the jurisdiction, to wit: funds or accounts held in the name of Petroexport Ltd. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Nara Bank; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Ambi Shipping Pte Ltd., prays:

1.    That a summons with process of attachment and garnishment may issue against the defendant, Korea Line Corp; and if defendant cannot be found, then that its goods, chattels and credits within the district, and particularly all bank accounts and other property of Korea

4

Line Corp with the financial institutions noted above in paragraph 18, may be attached in an amount sufficient to answer plaintiff's claim;

    2.    That defendant Korea Line Corp and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

    3.    That judgment be entered in favor of Ambi Shipping Pte Ltd. against Korea Line Corp in the amount of US $211,000.00 (including estimated interest, expenses and attorneys' fees); and,

    4.    That this Court grant Ambi Shipping Pte Ltd. such other and further relief which it may deem just and proper.

Dated: New York, New York
       March 26, 2008

HOLLAND & KNIGHT LLP

By: _____
James H. Power
Lissa D. Schaupp
195 Broadway
New York, NY 10007-3189
Tel:   (212) 513-3200
Fax:   (212) 385-9010

*Attorneys for Plaintiff*
*Ambi Shipping Pte Ltd.*

## VERIFICATION

STATE OF NEW YORK            )
                                              :ss.:
COUNTY OF NEW YORK          )

JAMES H. POWER, being duly sworn, deposes and says:

I am senior counsel with the firm of Holland & Knight LLP, counsel for Ambi Shipping

Pte Ltd. ("Ambi"), plaintiff in the foregoing action.  I have read the foregoing Verified

Complaint and know the contents thereof, and the same are true and correct to the best of my

knowledge.  I have reviewed documentation provided to me by Ambi and corresponded with

Ambi's representatives regarding this matter.  I am authorized by Ambi to make this verification,

and the reason for my making it as opposed to an officer or director of Ambi is that there are

none within the jurisdiction of this Honorable Court.

_____
James H. Power

Sworn to before me this
26 day of March, 2008

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 5211663_v1

6

# EXHIBIT 1



ORIGINAL

## Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913~ Amended October 20th, 1921; August 6th, 1913; October 3rd, 1946

1 **This Charter Party**, made and concluded in ........... *Seoul* ... *19th* ..........day of....... *May* ..........19... *2005* .........

2 Between *Ambi Shipping Pte Ltd.* as ...................................................... *Registered* ...............................................

3 Owners of the good *Singapore flag* ..........Steamship/Motorship........ *"Alam Makmur"* ...............................................of......

4 of....................tons gross register, and.......................tons net register, having engines of..................indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed...............................................................

6 at....................of about............ *59,820.4* ...................cubic metres feet grain bale capacity *in main holds available for cargo,*

6 and about.......... *46,644* ............ *metric tons of 2240 lbs.*

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of *11.62* feet *metres* inches on salt Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about.............................................................tons of fuel, and capable of steaming, fully laden *throughout the*

9 *currency of this Charter Party*, under good weather

10 conditions *upto* Beaufort force 4 about........knots on a consumption of about... *(See Clause 77)* ...tons of best Welsh coal best

10 grade fuel oil best grade Diesel oil,

11 now *trading (See Clause 77)* .......................................................................................................................

12 ...................................and....................... *Messrs. Korea Line Corporation*...............*as* Charterers of the City of *Seoul*

13     Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about.......................*minimum 23 months/maximum 25 months time charter in Charterers option, trading*

14 *via safe ports, safe berths, safe anchorages always afloat, always accessible always within I.W.L (See Clause 30) with*

15 *lawful harmless cargoes* ...........................within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.

18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot South Korea,*

19 *anytime day or night Sundays and Holidays included* ...............................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all time of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her

21 *arrival first and subsequent loadport(s) of first voyage* delivery to be

22 ready to receive *any permissible* cargo *(See also Clause 49). On delivery and throughout the Charter vessel to be with*

22 clean swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, *cranes* winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at

23 one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying

24 lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding *(See Clause 29)*.............................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports

27 *and/or safe places* in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America, ..................................................................................... and/or Europe

30 and/or Asia, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and may 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32 *Trading exclusions : See Clause 30.*.....................................................................................................

33 .......................................................................................................................................

34 .......................................................................................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36     1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and*

36 *watchmen other than compulsory*, shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, *cargo spaces*, machinery and equipment with *all certificates necessary to comply*

38 *with current requirements* at ports of call for and during the service.

39     2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory*

39 Pilotages, *but understood that pilotage Bosphorus Strait, Great Belt and Torres Strait to be for Charterers' account.* Agencies

39 *(except agency fee directly related to Owners matters)*, Commissions,





40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel *and/or her Owners are* is responsible, then all such charges incurred shall be paid by the Owners.
41 Fumigations ordered because of
42 illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried
42 or ports visited while vessel is employed under this
43 charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44 ~~of six months or more.~~
45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have
46 the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.
48    3. ~~That the Charterers, at the part of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than............tons and not more than~~
50 ~~............tons and to be re-delivered with not less than............tons and not more than............tons.~~ *See Clause 43.*
51    4. ~~That the Charterers shall pay for the *full* use and hire of the said Vessel at the rate of *U.S.$21,000 daily including over time (See Clause 33).*~~
52 ~~......................................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53 ~~stores, on............summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at
54 and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and
54 condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) at.................................... *(See Clause 73)* ....................................
56 ...unless otherwise mutually agreed. Charterers are to give Owners not less than *30/15/10/7/5 days approximate and 3/2/1 days definite*
57 notice of vessels expected date of re-delivery, and probable port.
58    5. Payment of said hire to be made in New York in cash in United States Currency, *15 days* ~~semi-monthly~~ in advance, and for the
58 last *15 days* ~~half-month~~ or
59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61 hire, or bank guarantee *or deposit*, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw
61 the vessel from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~ *(See also Clauses 63)*
65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.
68    6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *or anchorage in port or elsewhere*
68 that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~
70 ~~lie aground.~~ *(See Clause 81)*
71    7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74 ~~paying Owners............per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*
76    8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency; and Charterers are to load, stow, *secure, unsecure, lash, unlash,* and trim *and discharge* the cargo at their expense under
78 the supervision, *and responsibility* of the Captain, who, is to sign, *or when required by Charterers, authorize the Charterers or*
78 *their Agents to sign* Bills of Lading(s) *on his behalf* for
79 cargo as presented, *strictly* in conformity with Mate's ~~or Tally Clerk's~~ receipts.
80    9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82    10. That the Charterers shall have permission to appoint a Supercargo who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of *$10.00* per day. *Charterers and Supercargo to sign Owners' Letter of Indemnity prior to boarding vessel.* Owners
84 to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., Charterers ~~paying at the current rate per meal,~~ *to compensate Owners lumpsum U.S.$1,250 per*
85 *month or pro rata in respect of Charterers'* for all such victualling *cable/victualling/entertainment.*
86    11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-




88 terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs showing the course of the vessel
88 and distance run and the con-

89 sumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*

90   12. That the Captain shall use diligence in caring *for the cargo and* for the ventilation of the cargo.

91   13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~.............................................
92   ...........................................................................................................................................................................................
93 ~~on giving written notice thereof to the Owners or their Agents..........days previous to the expiration of the first named term, or any declared option.~~

94   14. ~~That if required by Charterers, time not to commence before~~.................... *(See Clause 82)* ...............*and should vessel*
95 ~~not have given written notice of readiness on or before~~.......................................................*but not later than 4 p.m.* Charterers or
96 their Agents to have the option of canceling this Charter at any time not later than the day of vessel's readiness.

97   15. That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency of* stores, fire,
97 breakdown or damage to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be
99 reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.

102   16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105   The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107   17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at
107 *Singapore* ~~New York,~~

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.  *See further*
109 *Arbitration Clause 38.*

110   18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the Owners in the vessel.

114   19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and~~
115 ~~Rule F of~~

116 York-Antwerp Rules ~~1924~~ *1974 and subsequent revisions at Singapore,* ~~at such port or place in the United States as may be selected~~
116 ~~by the carrier,~~ and as to matters not provided for by these

117 Rules, according to the laws and usages at the port of *Singapore* ~~New York. In such adjustment disbursements in foreign currencies~~
117 ~~shall be exchanged into~~

118 ~~United States money at the rate prevailing on the date made and allowance for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~   *Charter hire not to contribute to General Average.*

126   ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~

132   ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133   20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.  *No deduction from hire to be made for domestic consumption*

134   21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 ...........................................................................................................................................................................................




139 ......................................................................................................................................................................

140    22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks/*cranes*) capable of handling lifts up to

140 *their maximum capacity in accordance with the description clause* ~~three tons, also~~

141 *providing ropes, falls, slings and blocks.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide~~

141 ~~necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power*

142 *and electric lights on deck and in cargo holds sufficient for night work in all holds simultaneously.* ~~lanterns and oil for~~

143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The

144 Charterers to have the use of any gear on board the vessel.

145    23. Vessel to work night and day, if required by Charterers, and all winches *cranes* to be at Charterers' disposal during loading and discharging;

145 *provided sufficient crew hands are available and they are free from other duties and if permitted by local regulations*

145 *and provided crewing/employment contracts permit, around the clock as per terms/conditions of Clause 32.*

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147 ~~dock hands and dockeymen for overtime work done in accordance with 8/0s working hours and rates stated in the ship's articles.~~ If the rules of the

148 port, or labor unions, *crewing/employment contracts* prevent crew from driving *cranes* winches, shore *Cranemen Winchmen* to be

148 *employed and* paid by Charterers. In the event of a disabled *crane or cranes* winch or winches, or

149 Insufficient power to operate *crane or cranes* winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and

149 pay any loss of time *and extra expenses including standby expenses* occasioned

150 thereby. *Any time lost due to crane breakdown and/or insufficient power to be deducted pro-rata to the number of gangs affected.*

151    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,

153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *General*

153 *Clause Paramount* ~~the following clause, both~~

154 of which are *is* to be included in all bills of lading issued hereunder: *(See Clause 62)*

155                     U.S.A. Clause Paramount

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160                     Both-to-Blame Collision Clause

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~Owners as part of their claim against the carrying ship or carrier.~~

167    25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging.

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the

171 navigation of the vessel, insurance, crew, *acts of pilots and tugboats,* and all other matters, same as when trading for their own account.

172    27. A commission of *1.25* 2½ per cent is payable by the Vessel and Owners to......... *Jein Shipping Co., Ltd*

173 *and 1.25% to Netship Brokers PTY LTD.* ...................................................................................................................................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of *2.5* 2½ per cent payable to......... *Charterers* .........on the hire earned and paid under this Charter Party.

      *Clauses No.29 to 86 are incorporated in this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under license from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Charterers   KOREA LINE CORPORATION      Owners : AMBI SHIPPING PTE LTD

Y. H. CHO
VICE PRESIDENT
TRAMPER TEAM 1



# ORIGINAL

Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 29. Cargo exclusions.

The following cargoes are excluded from carriage:
ASBESTOS, ACIDS, SCRAP TURNINGS, MOTOR BLOCKS, LOGS, SULPHUR,COTTON, NEWSPRINT, PIG IRON, ASPHALT, PITCH, TAR, SUNFLOWER SEED EXPELLERS, PETROLEUM AND IT'S PRODUCTS, PYRITES, HIDES, CHARCOAL, FISHMEAL, MEAT MEAL, BONE MEALS, RESIN, COPRA, EXPLOSIVES (INCLUDING BLACK POWDER, BLASTING CAPS, DYNAMITE, TNT, FIREWORKS, ETC), LIVESTOCK, DANGEROUS AND/OR RADIO ACTIVE MATERIALS/FUEL/WASTE/ PRODUCTS, AMMONIUM NITRATES, ALL CARGOES LISTED UNDER IMO APPENDIX B, DIRECT REDUCED IRON, HOT BRIQUETTE IRON, SPONGE IRON, NAPHTHA, FERRO SILICON, MOTOR SPIRIT, TURPENTINE, AGGREGATES, BORAX, CALCIUM HYDROXIDE, CALCIUM CARBIDE, CALCIUM HYDROCHLORIDE,PALM KERNEL, EXTRACTION, EXPARTOGRASS, SEED CAKES, SALT, SALT CAKE, CREOSOTED GOODS, ALL TYPES OF BLOCKS INCLUDING STONE AND MARBLE BLOCKS, SCRAP, CEMENT AND CEMENT CLINKER (SEE BELOW), PETCOKE(SEE BELOW), ASBESTOS,AGGREGATES,CARGOES NOT COMPATIBLE WITH VESSEL'S CAPABILITY AND CONTRABAND CARGOES. CALIFORNIA BLOCK STOW NOT PERMITTED.

Grain/Fertilizers to Australia are allowed provided vessel's trading history is acceptable to this trade.

Notwithstanding the above, Charterers are allowed to load / carry grain, grain products/agricultural products including meals/pellets always excluding expellers/ sunflower seed expellers, copra pellets/products, oil cakes, rape seed expellers and fishmeal and all cargoes listed under IMO Appendix B, provided same loaded / stowed/ discharged in accordance with IMO regulations and BC REGS and vessel's class requirements.

Notwithstanding the above:

Charterers allowed 3 cargoes of bulk cement or cement clinker per annum but same not to be consecutively loaded and not to be last cargo before redelivery. Charterers to wash / clean all holds by fresh water after completion of discharge and to endeavor to thoroughly remove residues and cement dust in holds or on deck at Charterers time and expense. If cement holes are not available or not in the right positions, Charterers have the option to cut cement holes in vessel's hatch covers in connection with loading cement and/or cement clinker and reweld same after completion of loading. The cutting and rewelding to be done to class and master's satisfaction in Charterers' time and expense.

Charterers to have the option to carry alumina, soda ash, mineral sand including silica sand during the currency of this Charter Party provided Owners are not to be responsible for passing hold survey. If vessel fails hold survey, any/all time lost to be for Charterers account and vessel to remain on hire. In addition, any/all extra costs or expenses incurred for cleaning of vessel's holds to be for Charterers account unless same caused by lack of maintenance in which case same to be for Owners' account.

Charterers to have the option to carry two cargoes of bulk calcined and green delayed/raw petcoke during the currency of the Charter Party. Charterers are responsible for cleanliness of holds after discharge. If chemicals are required for cleaning the chemicals not to be of a nature causing damage to the paint and same to be for Charterers account. Petcoke not to be last cargo.

Sulphur - Charterers may load one cargo per annum if they can provide full compliance with the new SOLAS requirements for loading sulphur. This case, sulphur not to be the last cargo prior to redelivery



1



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

Salt - Owners are allowed to carry maximum 1 cargo of salt per annum and with a suitable lime wash clause, salt not to be the last cargo prior to redelivery

Scrap - Owners are allowed to carry maximum 1 cargo of non-oily scrap HMS 1+2 excluding MBT per annum and with a suitable soft loading clause. Scrap not to be the last cargo prior to redelivery

Pig Iron - The first layer of pig iron not to be released until touching tank top and not to be dumped/dropped during loading. First layer of pig iron to be evenly trimmed/stowed to satisfaction of Master before loading balance of cargo.

Clause 30. Trading exclusions.

Notwithstanding anything to the contrary contained in this charter, the Charterers warrant that the vessel shall not trade in the following places:

Israel, Syria, Libya (including Gulf of Sidra / Sirte), Somalia, Iraq, Iran, Cuba, Namibia, Nicaragua but vessel may call Nicaragua if Owners P+I club permits, Angola (including Cabina), Ethiopia, Albania, Cambodia, Laos, Congo, Democratic Republic of former Zaire, North Korea, UN Sanctioned ex-Yugoslavian countries, Federal Republic of Serbia and Montenegro, Croatia, Bosnia Herzegovina, Sea of Azov, Russian Pacific Ports, Haiti, Liberia, Turkish occupied Cyprus, Eritrea, Sri Lanka, Sierra Leone, Bosnia Herzegovina, War Zones and/ or war risk zones as declared by Lloyds and /or vessel's registry and/or vessel's underwriters. All areas/countries under United Nations Embargo/sanctions are to be excluded. The vessel is not allowed at any time to trade to ports/areas which are prohibited by the United Nations and/or the authorities of the country under which the flag the vessel is flying.

Iran, not north of Bushire, is permitted

Sea of Azov is allowed but only in summer

No direct sailing between PRC- Taiwan and Vice Versa

Vessel not to force Ice and not to follow an ice breaker

If Charterers require to call Sri Lanka for Bunkering then they need to obtain Owners approval which not to be unreasonably withheld.

Subject to Owners prior approval to Charterers formal request on a voyage by voyage basis, Charterers option to break IWL paying additional premium against supporting vouchers. Vessel not to force ice and not to follow ice breaker. Naabsa as per NYPE clause 6 wording but only permitted in South America only but excluding Venezuela / Orinocco and Columbia. Naabsa permitted in Buenaventura.

If circumstances applicable to any of the excluded areas or ports stipulated in this trading exclusion clause, should alter in such a manner so as to enable or permit the vessel to trade thereto, Owners and Charterers shall mutually discuss the effect of such changes with a view to reinstatement of the areas or ports concerned for permissible trading under this charter party. Permission for reinstatement to be considered on a case by case basis and always subject to Owners management approval which not to be unreasonably withheld





Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 31. Crew service.

With reference to clause 8 of this Charter Party "customary assistance" shall include, but not be limited to:
a) All opening and closing of hatches, when and where required, if permitted by local regulations.
b) Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging, if permitted by local regulations.
c) Deleted.
d) CShaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the Crew.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and Crew required under this Charter Party.

CLAUSE 32. Grab fitting/operation.

In case of grabs loading/discharging the Charterers will endeavor to employ shore people wherever available to operate vessel's cranes and grabs.    Should it however not be possible to employ shore people and provided crew employment contracts permit and crew are available from other vessel duties, the crew to operate as many cranes and grabs as absolute possible with the crew available for the purpose however minimum 2 cranes/grabs around the clock.

The Charterers will endeavor to have a superintendent on each of these occasions.    Charterers paying compensation to the crew through the Captain for such work at a rate of U.S.$ 0.30 per metric ton for loading or discharging.    The Owners are not to be responsible for efficiency of cargo work handled by the crew.    If rule of the port, or labor union prevent the crew from driving cranes/grabs, shore crane men/grabs operators to be provided by the Charterers for their account.    Charterers are responsible for any damage caused to vessel or her fitting/equipment as a result of crew operating cranes/grabs.    Crew always to assist with fitting/unfitting/shifting of the grabs.

Grabs and its accessories fitted on board to remain Charterers property.    The Owners undertake to maintain the grabs and its accessories as per instruction manual.    Master to forward detailed report every 3 months as to condition of grabs and maintenance performed since last report.    Charterers to pay U.S.$250.00 per month directly to the vessel for the above mentioned works.    Charterers undertake to pay all expenses in respect of repair and maintenance of the grabs and Owners not to be responsible for any breakdown.

CLAUSE 33. Hire.

Hire payable under this Charter Party shall be paid to Owners nominated bank:

Chase Manhanttan Bank, New York
Chips uid 268442
for account of ING Bank N.V. Singapore
favouring Ambi Shipping Pte Ltd
Account No : 264341.
(REF : ALAM MAKMUR/KLC C/P 19.5.2005 - CHIE PYMT)



3



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

Hire payable every 15 days in advance to Owners nominated bank account.   First hire and value of bunker of delivery to be paid within 3 banking days after vessel's delivery.

CLAUSE 34. In lieu of hold cleaning.

Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lump sum of US$ 5,000 in lieu of such cleaning. Any dunnage removal/disposal to be for Charterers account and in Charterers time. Dunnage removal always to be in accordance with international and local regulations.

In case of oil stains remaining in cargo holds on redelivery after having carried petcoke, Charterers to pay USD 7,000 In lieu of hold cleaning.

CLAUSE 35. Intermediate hold cleaning.

If required by Charterers during the currency of this Charter Party, the vessel's crew, where provided local regulations permit, to clean holds between cargoes, Charterers paying Owners U.S.$700 per hold for each such cleaning and the vessel remaining fully on hire while it is being effected at sea or in port. The work is to be carried out in the same efficient manner as if the vessel were trading for Owners account.   It is agreed that when intermediate hold cleaning is effected by the crew is done without any guarantee that the subsequent inspections will be passed.   Any shore labour required for cleaning holds under this charter to be for the Charterers account and cleaning to be carried out in Charterers time.

The crew to render customary assistance in cleaning/washing holds if required by Charterers and provided local/international regulations/weather/safety/time permit during this time charter. Charterers to pay Owners U.S.$1,000 per hold for performing intermediate hold cleaning for the cement/sulphur/salt/petcoke.

Charterers to pay Owners U.S.$ 800 per hold for performing intermediate hold cleaning in the case of petcoke.

CLAUSE 36. Deleted.

CLAUSE 37. Additional fittings.

Subject to Master's satisfaction Charterers have option to weld padeyes on deck/hatch cover/in holds at Charterers own arrangement/time/expenses and same to be removed prior to redelivery otherwise Charterers have option to redelivery vessel without removal padeyes by paying U.S.$10 per each padeye.
Welding operation should be under Master's supervision and satisfaction.

CLAUSE 38. Arbitration.

Arbitration to be held in Singapore and English Law to apply.

It is hereby agreed that all claims below U.S.$50,000.00 excluding interest and costs, shall be settled as per current LMAA Small Claims Procedure.



4



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 39. Arrest.

Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of the Clause no hire is payable.

This clause shall not apply should the arrest be caused through any fault on the part of Charterers, their agents and/or servants.

CLAUSE 40. Asian Gypsy Moth/Quarantine Regulations

Vessel is free from Asian Gypsy Moth, its eggs or larvae.
Owners guarantee vessel has not called Russian Pacific or Siberian ports.
Owners should be responsible for any expenses caused directly by failing in Asian Gypsy Moth inspection both at Canadian and U.S. ports.
Any expenses incurred directly thereby at loading ports and discharging ports to be for Owners account.

CLAUSE 41. Bill of Lading.

Charterers' Bills of Lading to be used if required by Charterers.

Owners/Master to authorize Charterers or their agent to sign original Bills of Lading if required by Charterers but always in strict conformity with Mate's receipt.

Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, way bill or other document evidencing a contract of carriage (whether or not signed) on behalf of the Owners or on the Charterers' behalf or on behalf or any Sub-Charterers incorporating where not compulsorily applicable the Hamburg Rules or any Legislation imposing liabilities in excess of Hague Visby Rules. Charterers shall indemnify Owners against any liabilities, loss or damage which may result from any breach of the provisions of this clause.    No through or liner Bills of Lading to be issued.

In case that original Bill(s) of Lading not avail at discharge port, Owners/Master to allow Charterers to discharge cargoes without presentation of original Bill(s) of Lading by providing Charterers' Letters of Indemnity in accordance with Owners' P and I Club format and wording before discharging.    Letters of Indemnity to be signed by Charterers.    Discharge to commence on receipt by Owners of faxed copy of the Letter of Indemnity.    Original copy of Letter of Indemnity must be mailed to Owners as soon as possible.

Attached please find the standard forms of Letters of Indemnity to be given in return for.
A) Delivering cargo without production of the original Bills of Lading.

Charterers hereby warrant that they will take all necessary steps to comply in all respects with U.S. customs requirements requiring a unique Bills of Lading identifier on all waybills, Seaway bills, cargo manifests and Bills of Lading.

All Letters of Indemnity's to be signed by an authorized officer of the Korea Line



5



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

(for the sake of convenience please forward a letter at the commencement of the Time Charter from the Board of Directors stating that Mr._____ Is an authorized officer of the Charterers and authorized to sign Letter of Indemnity's on behalf of the Charterers)

CLAUSE 42. Bulldozers.

Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding the tank top strength.

If required, Steveodores to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear.

CLAUSE 43. Bunkers.

Bunkers on delivery about 500 metric ton IFO plus about 60 metric ton MDO.
Bunkers on redelivery to be same as on delivery.
Prices bends U.S.$ 275 per metric ton IFO and U.S.$ 480 per metric ton MDO bends.
Value of bunkers to be paid on delivery.
Charterers/Owners to have the privilege to bunker the vessel prior to delivery/redelivery provided same does not interfere with discharging operations.

Estimated cost of bunkers remaining onboard on redelivery to be deducted from last sufficient hire.

Charterers have the option to bunker vessel for their own account in their time/risk/expense prior to delivery provided the bunkering operation does not interfere with vessel's operation.    Owners to have the same option prior to redelivery.

Charterers undertake bunker supply to comply with following specs:
IFO ISO 8217 RMG35 (380 CST)
MDO ISO 8217 DMB

In order to comply with the terms and conditions of the various bunker suppliers, the sample to govern quality shall be the sample drawn by the supplier and witnessed by the ship's Chief Engineer or Surveyor appointed by Owners. Analysis of said sample in accordance with the recognized ISO test methods at a mutual agreed reputable and dedicated laboratory shall be binding and conclusive for both parties.

Any claim in relation to fuel purchased by Charterers shall be filed and documented within 21 days from day of delivery, failing which claim will be deemed waived.

Quantity supplied shall be finally determined by sounding of the tanks of the delivering barge or by reading of meters at shore installation and sounding of ship's tanks.

CLAUSE 44. Cargo claims/P. & I. Club

Owners guarantee that the vessel is entered and shall remain entered in a Protection & Indemnity Association, which is a member of the Group of International P. & I. Clubs, for the duration of this Charter Party.    Entry shall include, but not to be limited to, ordinary cover for cargo claims.

It shall be considered a fundamental breach by Owners if the vessel's P. & I. cover or class is cancelled





6

Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

or suspended during the currency of this Charter.

Charterers are not responsible for any accident or damage to or on board the vessel, which is covered with Owners' Hull & Machinery policy.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of suit in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims, as between Owners and Charterers, shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers Owners to authorize and instruct Owners P. & I. Club to confirm directly to any Party as ordered by Charterers that the vessel is fully covered for P. & I. and that collection of premiums are up to date.

Owners' P. & I. Club: Assuranceforeningen Skuld, Oslo
Charterers' P. & I. Club: North or England

CLAUSE 45. Certificates/vaccinations.

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her Crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her Crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and Crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.

If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.

Any time lost and all extra directly related expenses resulting from Owners' non-compliance with the above to be for Owners' account and same may be deducted from hire.

CLAUSE 46. Deductions.

Charterers are entitled to deduct from last sufficient hire payments estimate Owners' disbursement but maximum at the end of the sentence. Any Owners matter/items at ports of call to be settled directly by Owners and the agents. As well as value of B.O.R.

CLAUSE 47. Delivery/redelivery time.

For the purpose of computing hire payments, the time on delivery/redelivery to be based on G.M.T bends, laydays/cancelling to be local time basis.



7



Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 48. Double banking.

Charterers have the right to load and/or discharge on double banking basis or by any other means available at loading and/or discharging port or place always subject to Master's reasonable satisfaction and any additional equipment/facilities such as fenders, whenever considered necessary by the Master, are to be supplied by the Charterers in their time and at their expense.

If at any time during the operation, the Master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the lowest premium obtainable on the Lloyds' London market.

CLAUSE 49. Hold condition on first voyage.

Vessel's holds on delivery or at first load port to be clean, swept, washed down by fresh water and dried up so as to receive Charterers intended cargoes in all respects free of salt, loose rust scale and previous cargo residues to the satisfaction of the independent surveyors.
Should the vessel not be approved by the surveyor then vessel to be placed off-hire from the time of failure of inspections until vessel is fully accepted. Any directly related expenses due to such failure to be for Owners account.

If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those which are accepted, and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartments, which have passed survey.

CLAUSE 50. ITF/Boycott.

Owners warrant that the vessel's Crew is and will be during the period of this Charter Party employed under a bona fide union agreement, the standard of which is fully acceptable to the I.T.F. and unions in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labor and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the Crew are employed or by reason of any trading of this or any other vessel under same Ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire.

CLAUSE 51. Inspection.

The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, freshwater tanks during the Charter period. Whenever required, the Master must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their supercargo(es) and/or Surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, radio logs, tank plans, calibration scales, and/or other plans as requested and are allowed to make copies of same.



8



Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 52. Insurances.

Premium for basic war risks insurance on hull and machinery and Officers/Crew always to be for Owners' account. Any additional premium net of all rebates in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as excluded areas by vessel's war risks Underwriters to be for Charterers' account, however, same not to exceed what would have been quoted or charged if the vessel was covered on the London market. If Owners have not covered basic war risks insurance, Charterers only to pay the differential as if Owners were covered and only against presentation of Underwriters' original invoice. Blocking and trapping insurance always to be for Charterers' account.

CLAUSE 53. Laying up/return insurance.

Charterers shall have the right to order the laying up of the vessel at any time and for any period of time at a safe berth or anchorage, and in the event of such lay-up, the Owners shall promptly take steps to effect all the economy savings in operating costs including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economy savings.

At the request of the Charterers the Owners shall at any time provide an estimate of the economy savings, which would be possible in the event of laying up of the vessel. The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days, provided the vessel is on hire.

CLAUSE 54. Loading of steel.

If the vessel is nominated to load a full or part cargo of steel products, the Owners to appoint an Independent Surveyor to perform a "pre-loading cargo condition survey", provided that such survey is required or recommended by the Owners' P. & I. Club. Such survey is to take place in Charterers' time, and survey costs to be for Charterers account. Copy of such survey to be given to Charterers without delay.

CLAUSE 55. Notices.

Owners to give Charterers 10/5 days approximate notice and 3 days definite notice of expected date and place of delivery and Owners to keep Charterers advised of vessel's movements from time to time prior to delivery.

CLAUSE 56. Off-hire.

Should the vessel put back whilst on voyage by reason of any accident or breakdown, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the Crew or any person onboard the vessel (other than supercargo traveling by request of the Charterers) or by reason of the refusal of the Master or Crew to perform their duties, or by reason of salvage, however, not including assistance rendered to another vessel in distress, or oil pollution even if alleged, or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position in Charterers' option, and voyage resumed there from. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.



9



Seoul, 19th May, 2005 MV Alam Makmur

The Charterers may in their option, partly or wholly, add any off-hire period(s) to the time charter period to be declared for each Charter year by the end of each such year.
During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

If the vessel has been off-hire for a period of more than 45 consecutive days excluding regular docking/surveys, the Charterers are at liberty to cancel the balance of this Charter Party, in which case redelivery shall take place upon vessel being free from cargo, irrespective of redelivery ranges.

CLAUSE 57. Oil Pollution.

Owners guarantee to provide and maintain, during the entire Time Charter period, at their expense and carry onboard the vessel a valid U.S. Certificate of Financial Responsibility.   Owners also guarantee to have secured current certificate for other countries/federal states or municipal or other division or authority thereof, where guarantees are required.   All such certificates to be valid throughout the entire time charter period.

The Charterers shall in no case be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates.   Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any consequential losses, damages and expenses.

CLAUSE 58. On/off hire survey.

At port of delivery or first load port, in Owners' time and at last discharge port prior to redelivery, in Charterers' time, a joint on/off-hire survey to be held by a single independent Surveyor jointly appointed.   Cost of same to be equally shared between Owners and Charterers.   Vessel only to be off-hire for actual working time lost due to surveys.

CLAUSE 59. Panama/Suez Canal.

Owners warrant that the vessel if fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise.   Should the vessel not comply with the warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners failure to comply with this warranty.

CLAUSE 60. Plans.

Owners to courier to the Charterers capacity plan, deadweight scale, and general arrangement plan as soon as possible/practical.

CLAUSE 61. Deleted

CLAUSE 62. Protective clauses.

The General Clause Paramount, the New Both to Blame Collision Clause, the New Jason Clause,





Seoul, 19th May, 2005 MV Alam Makmur

Baltic Conference War Risks Clause for Time Charters 1993 (Code name: Conwartime 1993), P. & I. Bunkering Clause, as applicable and attached are all to be considered as incorporated into this Charter Party and all Bills of Lading issued under this Charter shall be subject to all said clauses and contain Voywar 1993.

Should a particular trade on which the vessel is employed apply the USA or Canadian Clause Paramount compulsorily then such clauses to be considered incorporated into this Charter and shall be incorporated into Bills of Lading on that trade.

CLAUSE 63. Punctual payment.

With reference to clause 5, the Owners to give Charterers 3 New York banking days written notice excluding Sundays and Holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

CLAUSE 64. Sea Carrier Initiative Agreement.

Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

CLAUSE 65. Stevedore damage.

Should any damage be caused to the vessel or her fittings by the Charterers or their Stevedores the Master is to:

a) Give written notice to the Charterers as soon as practicable after the occurrence of full particulars of the damage caused and name of the Party allegedly responsible for the damage.

b) Promptly but latest within 24 hours or as soon as reasonably possible after occurrence give written notice to the Party Allegedly responsible, giving full particulars of the damage and its alleged cause, and try to obtain the written acknowledgement of liability from such Party or failing that, the acknowledgement of receipt of such notice.

c) As soon as practicable arrange, in conjunction with Charterers' agents, for the damage to be surveyed and an estimate of the repair costs given.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage, which must be attended to as per the above procedure as soon as it is discovered but latest upon completion of the voyage in question.

Charterers shall have the liberty to redeliver the vessel without repairing the damages for which Charterers are responsible, as long as the same do not affect vessel's seaworthiness and normal working, but Charterers undertake to reimburse costs of repairs against production of repair bill by repairers or dockyard unless otherwise agreed.

CLAUSE 66. Taxes.

Taxes and/or dues and/or charges whatsoever, imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers.    Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the





Seoul, 19th May, 2005 MV Alam Makmur

hire payable to Owners shall be for Charterers' account.

CLAUSE 67. Warranties.

Owners warrant that the vessel:
- is not blacklisted by trading countries due to vessels flag/ownership/operators/age.
- has not traded Cuba since delivery from shipyard, and Israel.
- is eligible for bunkers in The United States of America, its territories and possessions, in accordance with directives from The United States Department of Commerce, Office of International Trade.
- was not relation to Ex-Yogoslavia in vessel's flag/ownership/crew/etc.
- holds are to be clear of any fitting/super structures such as cardeck curtain plates, container fitting.

CLAUSE 68. Watertight hatches.

Owners confirm that vessel's hatch covers to be watertight all throughout this charter period and if any hatch cover found detective, same to be rectified at Owners' time and expenses upto independent surveyors' satisfaction provided damage caused by Owners/Master/Crew.    If damage to hatch caused by stevedores and/or Charterers and/or shippers and/or receivers and/or their agents then same to be for Charterers account.

CLAUSE 69. Weather routing.

The Charterers may supply either Ocean routes or DMI weather bureau or equivalent routine service company advises to the Master, during voyages specified by the Charterers and the Master shall comply with the reporting procedure of the weather bureau, however, the Master remains responsible for the safe navigation and choice of route.    Alternatively Charterers have the option to instruct the Master to report daily to a weather bureau during the execution of sea voyages.    The weather bureau will subsequently produce a performance analysis report in accordance with English Law.

Evidence of weather conditions shall be taken from the vessel's deck logs and independent weather bureau's reports.    In the event of discrepancy between the deck logs and the independent weather bureau's reports, the independent weather bureau's reports shall be final and binding on both parties, if settled amicably.

CLAUSE 70.

In case Charterers load steel slabs, Charterers to have option to apply vertical/block stowage in loading within vessel's tanktop strength and subject to Master's approval/satisfaction.
Vessel is not fitted with securing pad-eyes or securing rings or choking materials for lashing for such stowage.    Charterers to provide all sufficient securing pad-eyes/securing rings/choking materials/etc for such stowage as per Master's request and upto Master's satisfaction.    Charterers to remove the pad-eyes/securing rings/choking materials/etc after discharging and the surface must be grinded and repainted to vessel hold's original colour.    However if same not carried out by Charterers, then Charterers to pay Owners U.S.$10 per each padeye/securing rings/choking materials/etc to carry out such removal in order not to affect next loading.

California block stow may be permitted on a case-to-case basis provided sufficient notice is given to the Owners. This is always subject to Owners prior approval which not to be unreasonably withheld.





Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 71. Towage, Pilotage, Etc.

The Owners authorize the Charterers, as agents of and on behalf of the Owners and/or the vessel, to arrange and contract for any towage, pilotage or the like service on usual or customary terms and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.

CLAUSE 72. War cancellation.

In the event of outbreak of war between any two or more of the following countries:
The United States of America, Russia, The United Kingdom, France and People's Republic of China directly affecting the performance of this Charter, either Party has the right to cancel this Charter or any remaining portion thereof.

CLAUSE 73.
Redelivery range as follows:

Dropping last outward sea pilot one safe port
    A) Aden/PMO/Singapore-Japan rang including Malaysia, Thailand, South Korea, PRC, Vietnam, Taiwan, Indonesia, Philippines
    B) Skaw-Passero range including UK, Eire
    C) Australia/New Zealand range
    D) Vancouver/Panama range
    E) Boston/Buenos Aries range
    F) Capetown/Durban range
  Port in Charterers option anytime day or night, Sundays and holidays included.

CLAUSE 74. Sale Clause.

Owners to have the option to sell the vessel during the currency of this Charter Party with charter back but always subject to Charterers approval which not to be unreasonably withheld.    If Charterers do not approve of the buyers, sellers (Owners) guarantee to fully perform the balance of the charter as disponent Owners and to fulfill the Charter Party obligations.

CLAUSE 75. ISM Code.

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter and during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.    Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.    Any loss, damage, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for Owners' account.

CLAUSE 76. Lien.

In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate with Charterers in exercising a lien over the cargo and shall retain possession of the cargo on their behalf and deal with the cargo on Charterers instructions.    This is to be carried out in Charterers' time and at Charterers' risk.



13



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

Charterers to fully indemnify Owners for any consequences by carrying out Charterers' instructions.

CLAUSE 77. Description.

Vessel: MV ALAM MAKMUR
Type: SD BC Geared Bulkcarrier
Built October 2000 Mitsui Tamano Shipyard
Flag Singapore
Class NK
SDWT 46,644 mt
SDFT 11.62 mtrs
Holds 5
1) 10,355.5 / 9,885.6
2) 12,547.2 / 11,974.7
3) 12,583.4 / 11,930.9
4) 12,679.7 / 12,137.1
5) 11,654.6 / 11,308.4
Hold Dimensions MAX LENGTH X BREADTH X HEIGHT (M)

| | | | |
|---|---|---|---|
| H1 | 27.60 | X 31.0 | X 15.61 |
| H2 | 28.80 | X 31.0 | X 15.61 |
| H3 | 28.80 | X 31.0 | X 15.61 |
| H4 | 28.80 | X 31.0 | X 15.61 |
| H5 | 28.80 | X 31.0 | X 15.61 |

Hatches 5 End folding type, hydraulic operated, double skin
       NO 1) 17.60 X 17.16 M
          2-5) 20.80 X 17.16 M
Hold Tanktop Strengths No. 1) 24.00 MT/M2
                         2) 17.00 MT/M2
                         3) 24.00 MT/M2
                         4) 17.00 MT/M2
                         5) 24.00 MT/M2
Upper deck - 3.80 mt / m2
Hatch cover - nos.1-5 all 2.45 mt / m3

Cranes 4 x 30 t   Electro hydraulic
No.1 between 1-2  hatches  30 mt 26m at 20 deg
No.2 between 2/3  hatches  30 mt 26m at 20 deg
No.3 between 3-4  hatches  30 mt 26m at 20 deg
No.4 between 4/5  hatches  30 mt 26m at 20 deg
Grabs 4 x 12 cbm Peiner electro hydraulic grabs
Grain/bale 59,820.4 / 57,236.7 cbm

ITF Yes
WWF Yes
AHL Yes
GRT 27,011
NRT 16,011
LOA 189.8 mtrs
TPC 51.49
Beam 31 mrs



14



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

Speed and consumption in good weather conditions up to BF 4 and DSS 3 and no negative swell / no adverse current.
About 13.5 knots on about 24 mt IFO ISO 8217 RMG 25 (380cst) Laden
About 13.5 knots on about 21 mt IFO ISO 8217 RMG 25 (380cst) Ballast
Plus about 1.6 mt ifo for aux engine at sea ndas

Consumption in port
HFO for boiler about 0.6 mt /day
Diesel Generator  - Idle about 1.2 mt /day
Diesel Generator - gears working abut 8 hrs /day about 2.2mt / day
Diesel Generator - gears working abt 24 hrs /day about 3.0mt / day
IFO ISO 8217 RMG 35 and MDO IS) 8217 DMB
Vessel has liberty to use MDO in her main engine on entering /leaving ports, maneuvering in canal/river/shallow/narrow/busy waters

Hull and Machinery Value: USD 30,400,000.00
Underwriters Norwegian Hull Club P and I Club Skuld Oslo
Call Sign S6QS7
Inmarsat C GMDSS         456 329 740
Inmarsat B Tlx           356 329 780
Inmarsat B Tel           356 329 750
Inmarsat B Fax           356 329 760
All details 'about' and 'without guarantee'

CLAUSE 78. Gangway Watchmen.

Gangway watchmen for Owners' account.   Gangway watchmen for cargo and all compulsory shore gangway watchmen to be for Charterers' account.

CLAUSE 79. Marine Growth.

If the vessel is encountering prolonged stay, minimum 30 days in a port and there is strong reason to believe that the vessel's hull has acquired excessive marine growth affecting vessel's speed/consumption due the stay at this specific port, Owners are to arrange for a diver inspection. Should the result of this diver inspection indicate there is excessive marine growth on the hull, which is directly related to this specific port stay, Owners to arrange underwater scrubbing of the hull in Charterers time prior to vessel's departure from the port, if same can be done without unreasonable delay.   If the underwater scrubbing is not available or cannot be carried out at the port in question, same to be carried out in Charterers time in the next convenient port, Charterers agree not to claim for under performance of the vessel for the passage from the port in question until underwater scrubbing is carried out, provided the under performance is directly related to the above specific port stay.   The cost of the diver inspection and underwater scrubbing to be for Charterers account.

CLAUSE 80. Agency Fee.

Owners have the right to use Charterers' agents for minor matters such as delivery of crew mails etc without paying agency fee.





Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

CLAUSE 81. NAABSA Clause.

Vessel always afloat except NAABSA in Brazil/Argentina only as per NYPE Clause 6, other ports in EC S.AMERICA to be subject to Owners approval which not to be unreasonably withheld.

Owners have the option to arrange inspection of vessel's bottom and underwater parts by diver and/or class surveyor at a convenient port if vessel has touched bottom at the NAABSA port.   If any damage is found to vessel's bottom or underwater part, any extra time incurred and expense for such inspection shall be for Charterers' account.   If no damage is found to vessel's bottom or underwater part, any extra time incurred and expense for such inspection shall be for Owners' account.   Charterers to remain responsible for loss of time and also the damage to vessel arising from trading to NAABSA ports but Charterers' liability shall be limited to the hull policy deductible, which is not recoverable from hull underwriters.   Current policy deductible is U.S.$ 100,000.00 each accident.

CLAUSE 82. Laycan.

25th June - 15th July, 2005 To be narrowed

CLAUSE 83. USDA/NCB Clause.

Owners guarantee that vessel free from Asian Gypsy Moth and never called CIS pacific ports for last three year otherwise Owners to be responsible for any consequences caused directly therefrom.
Furthermore Owners guarantee that vessel meets all national cargo bureau/united states department of agriculture plant protection and quarantine office regulations.

CLAUSE 84.

Vessel to be suitable for loading grain.   Owners warrant that vessel is classed/approved as single deck self trimming bulk carrier.
Vessel to be suitable for grab discharge and bulldozer operations in holds upto vessel's maximum permissible tanktop strength.
Owners confirm that vessel has on board an approved grain loading plans for untrimmed ends.

CLAUSE 85. Dry-dock clause.

Owners have the option to place the vessel in drydock during the currency of this Charter Party. Vessel is due for drydock latest 31 October, 2005 within Singapore/Japan range but excluding Japan seaside. (Intention Far East )
Except in case of emergency, Owners shall give Charterers three (3) months notice of their intention to dry-dock the vessel.
Charterers to programme the vessel to the stipulated range in order to accommodate this dry-docking schedule.

Charterers to give Owners minimum 45 days approximate notice of when and where vessel will be redelivered to Owners for dry-docking.
Vessel to be redelivered at dropping last outward sea pilot one safe port Singapore-Japan range but excluding Japan seaside.   Charterers to give definite notice of vessels redelivery for dry-docking in the same manner as redelivery notices in Charter Party Clause 4.

Vessel is to be placed off-hire from the time/place where she redelivered to the Owners and to be



16



Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

placed on hire when she is again ready at Charterers' disposal in the same or equidistant position at Charterers option, as when she went off-hire.

If vessel is to dry-dock at a port where Charterers are loading/discharging/bunkering her, then vessel to go off-hire on leaving load/discharge/bunker place, and to go on-hire again on leaving dry-dock. However, should Owners take the vessel for such dry docking to a port which in actual fact brings vessel nearer to Charterers next loading/delivery point, Charterers shall reimburse Owners for actual time/bunkers saved. For bunker consumption, actual consumption as per Master's figures to be used at the Charter Party price.

In case of delivery at Singapore after drydocking, no drydocking except in case of emergency.

CLAUSE 86.

This negotiation/eventual fixture to be kept with strictly private and confidential.





Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, consignees, or Owners of the goods shall contribute with the Carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ships is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, consignees or Owners of the goods to the Carrier before delivery.

### NEW BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier."

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

### P & I CLUB OIL BUNKERING CLAUSE

The vessel shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading and discharging named in this Charter Party and may there take oil bunkers in any quantity at the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.




Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

BIMCO STANDARD WAR RISKS CLAUSE FOR
TIME CHARTERS, 1993
CODE NAME: CONWARTIME 1993 :

(1) For the purpose of this Clause, the words :

(A) "Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other Operators who are charged with the management of the Vessel, and the Master, and

(B) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or Crew or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, Crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, Crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.    Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or Crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right of search and/or confiscation.

(4) (A) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the Crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.

(B) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' order, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners becomes liable under the terms of employment to pay to the Crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.




Additional Clauses to the Charter Party dated

Seoul, 19th May, 2005 MV Alam Makmur

(6) The Vessel shall have liberty:

    (A) To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their order or directions;

    (B) To comply with the order, directions or recommendations of any war risks Underwriters who have the authority to give the same under the terms of the war risks insurance;

    (C) To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

    (D) To divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

    (E) To divert and call at any other port to change the Crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers.

    No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clause (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.




**RIDER CLAUSES TO MV "ALAM MAKMUR"**

**CHARTER PARTY DATED 27TH MAY, 2003**

A.
STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR
DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILLS OF LADING.

| | |
|---|---|
| To : | (insert name of Owners) |
| The Owners of the | (insert name of ship) |

Dear Sirs,
| | |
|---|---|
| Ship : | (insert name of ship) |
| Voyage : | (insert load/discharge ports, as stated in the Bill of Lading) |
| Cargo : | (insert description of cargo) |
| Bill(s) of Lading : | (insert identification number, date and place of issue) |

The above cargo was shipped on the above vessel by (insert name of shipper) and consigned to
(insert name of consignee or to whom order the Bill of Lading is made out, as appropriate) for
delivery at the port of (insert name of discharge port stated in the Bill of Lading) but the Bills of
Lading have not arrived and we, (insert name of Party requesting delivery), hereby request you
to give deliver of the said cargo to (insert name of Party to whom delivery is to be made)
without production of the original Bill(s) of Lading.

In consideration of your complying with our above request, we hereby agree as follows :

1.      To indemnify you, your servants and agents and to hold all of you harmless in respect
of any liability, loss, damage or expenses of whatsoever nature which you may sustain by
reason of delivering the cargo in accordance with our request.

2.      In the event of any proceedings being commenced against you or any of your servants
or agents in connection with the delivery of the cargo as aforesaid to provide you or them on
demand with sufficient funds to defend the same.

3.      If, in connection with the delivery of the cargo as aforesaid, the ship or any other ship
or property belonging to you should be arrested or detained or if the arrest or detention
thereof should be threatened to provide on demand such bail or other security as may be
required to prevent such arrest or detention or to secure the release of such ship or property
and to indemnify you in respect of any liability, loss, damage or expenses caused by such
arrest or detention or threatened arrest or detention whether or not such arrest or detention or
threatened arrest or detention may be justified.

4.      As soon as all original Bills of Lading for the above cargo shall have come into our
possession to deliver the same to you, whereupon our liability hereunder shall cease.

5.      The liability of each and every person under this indemnity shall be joint and several
and shall not be conditional upon your proceeding first against any person.    Whether or not
such person is Party to or liable under this indemnity.

6.      The liability of each and every person under this indemnity shall in no circumstances
exceed 200% of the CIF value of the above cargo.

7.      This indemnity shall be governed by and construed in accordance with English law
and each and every person liable under this indemnity shall at your request submit to the





## RIDER CLAUSES TO MV "ALAM MAKMUR"
## CHARTER PARTY DATED 27TH MAY, 2003

jurisdiction of the High Court of Justice of England.

Your faithfully,
For and on behalf of
(insert name of Requestor)

.....................................
**Signature**







**ORIGINAL**

Seoul, 19th May, ~~2004~~ 2005



### ADDENDUM NO. 1
### to
### M.V. "ALAM MAKMUR"
### CHARTER PARTY DATED SEOUL, 19TH MAY, ~~2004~~ 2005

It is this day mutually agreed and understood between AMBI SHIPPING PTE LTD., as Owners and KOREA LINE CORPORATIION, Seoul as Charterers that:-

ISPS Clause for Time Charter Parties

(a)(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) or any local law, legislation or regulation of the flag of the vessel or places called at by the vessel (all referred to hereafter jointly as "THE ISPS CODE")in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by





failure on the part of the Charterers to comply with this Clause
shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all
delay, costs or expenses whatsoever arising out of or related to
security regulations or measures required by the port facility or
any relevant authority in accordance with the ISPS Code including,
but not limited to, security guards, launch services, tug escorts,
port security fees or taxes and inspections, shall be for the
Charterers' account, unless such costs or expenses result solely from
the Owners' negligence. All measures required by the Owners to comply
with the Ship Security Plan shall be for the Owners' account.

(d)If either party makes any payment which is for the other party's
account according to this Clause, the other party shall indemnify the
paying party.

(e) Charterers guarantee that the ports to which they direct the vessel
comply at all times while the vessel is at the port with all requirements
of the ISPS Code. Owners are entitled to refuse to proceed to a port not
complying with the ISPS Code. All costs and consequences arising
from or in connection with calls at ports not complying with
the ISPS Code to be for Charterers' account.

All other terms, conditions and exceptions of the Charter
Party dated Seoul, 24th November, 2004 to remain in full force and to apply.

Charterers:                                    Owners: AMBI SHIPPING PTE LTD

KOREA LINE CORPORATION

Y. H. CHO
VICE PRESIDENT
TRAMPER TEAM 1







# ORIGINAL



Seoul, 19th May, 2005

### ADDENDUM NO. 2
### to
### M.V. "ALAM MAKMUR"
### CHARTER PARTY DATED SEOUL, 19TH MAY, 2005

It is this day mutually agreed and understood between AMBI SHIPPING PTE LTD., as Owners and KOREA LINE CORPORATIION, Seoul as Charterers that:-

U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR, 4,7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

  i) Have in place a SCAC (Standard Carrier Alpha Code);
  ii) Have in place an ICB (International Carrier Bond);
  iii) Provide the Owners with a timely confirmation of   i ) and  ii) above; and
  iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4,7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.





All other terms, conditions and exceptions of the Charter
Party dated Seoul, 24th November, 2004 to remain in full force and to apply.

Charterers:

KOREA LINE CORPORATION

Y. H. CHO
VICE PRESIDENT
TRAMPER TEAM 1

Owners: AMBI SHIPPING PTE LTD





EXHIBIT 2

| | | |
|---|---|---|
| **Vessel** | : | M.V. "Alam Makmur" |
| **Voyage** | : | **52L** |
| **Loading port** | : | Shanghai, China |
| **Destination** | : | Houston, USA |
| **Cargoes** | : | Steel Cargoes as per Shipping Orders |

## CAPT'S REMARKS AND COMMENTS

**S/O No.DWLGMAKHOU70090**   282 Pieces / 835.520 mts
Steel Pipe

1). Quantity by COSTACO Shanghai, weight said to be, quality unknown
2). Loaded from open storage, unprotected, exposed to all weather conditions before loading
3). Spot or patch rust apparent on surface, all pcs affected
4). Scratch or score marks apparent on pipes surface, 132 pieces affected
5). 1 or 2 pcs metal ring bent or loose or lost, 96 pieces affected
6). End edge dented or bent where handling gear marked, 72 pieces affected
7). 98 pcs topped by seamless casing at shipper's and charter's consent

| | | | |
|---|---|---|---|
| **Captain** | : | Lincoln Ivan Bernard | M.V. "Alam Makmur" |
| **Signature** | : | | |
| **Stamp** | : | | |

```
M.V. ALAM MAKMUR
      SINGAPORE
OFF NO.   388828
GRT.      27011
NRT.      18011
K.W.       7428
```

EXHIBIT 3

04/17/2007 08:48 FAX                Greater Bay Intl                    @003/003

CODE NAME: "CONGENBIL". EDITION 1994                                    Page 2

Shipper                                    **BILL OF LADING**        B/L No.
                                           TO BE USED WITH CHARTER-PARTIES    DWLGMAKHOU70090

PANYU CHU KONG STEEL PIPE CO., LTD.                                   Reference No.
QINGHE ROAD, SHIJI TOWN PANYU, GUANGZHOU CITY,                              7/3
GUANGDONG, CHINA

Consignee

                                           CARRIER: DAEWOO LOGISTICS CO., LTD.

TO ORDER OF SHIPPER


Notify address

ATTN: GEORGE QUINTANA KURT ORBAN PARTNERS LLC                    **ORIGINAL**
111 ANZA BLVD, SUITE 350 BURLINGAME, CA, 94010
TEL: 650-5793959, FAX: 650-579-3965


Vessel                          Port of loading
ALAM MAKMUR    V.MAK001/        SHANGHAI PORT, CHINA
Port of discharge
HOUSTON TX.
Shipper's description of goods                                        Gross weight
N/M            282 PIECES                                             135,520.00KGS

                COVERING SHIPMENT OF:
                11020.31FT DSAW CARBON STEEL PIPE IN ACCORDANCE WITH API 5LB
                PSL 1, 42 INCH OD, AS PER APPLICANT'S ORDER NO. 005156-A.
                SHIPPING TERMS – CFR HOUSTON, TX, BULK VESSEL, FREE OUT.

| 005156-A | | | | |
| Sri | Outside Diameter | W.T. | Qty | Qty |
| | Inch | Inch | PCS | FT |
| 1 | 42 | 0.375 | 282 | 11020.31 |
| Total | | | 282 | 11020.31 |

L/C NO.: IM12599                                          **ON BOARD**
SHIPMENT DOES NOT CONTAIN ANY SOLID WOOD PACKING MATERIALS.
CLEAN ON BOARD                                            SHANGHAI (2)
FREIGHT PREPAID
SHIPPED ON BOARD DATE: 30 MARCH, 2007                     3 0 MAR 2007

        TOTAL TWO HUNDRED AND EIGHTY TWO PIECES ONLY.
        (of which                    as Deck at Shipper's risk the Carrier not
        being responsible for loss or damage howsoever arising)

Freight payable as per           **S H I P P E D** at the Port of Loading in apparent good order and
CHARTER-PARTY dated                 condition on board the Vessel for carriage to the
                                 Port of Discharge or so near thereto as she may safely get the goods
FREIGHT ADVANCE.                 specified above.
Received on account of freight   Weight, measure, quality, quantity, condition, contents and value
                                 unknown.
                                 IN WITNESS whereof the Master or Agent of the said Vessel has signed
                                 the number of Bills of Lading indicated below all of this tenor and date,
Time used for loading    days    hours.    any one of which being accomplished the others shall be void.

                                 FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

                                 Freight payable at          Place and date of issue   3 0 MAR 2007
                                                                                       CHINA ROUTE INTERNATIONAL SHIPPING AGENCY LTD.
                                 Number of original B/L.     Signature

C.15   Printed and sold by          THREE(3)
       Witherby & Company Limited, 32/36 Aylesbury Street,
       London EC1R 0ET.                                       ON BEHALF OF THE MASTER
       Tel 0171 251 1944. Fax No.0171 251 1945
       by authority of The Baltic and International Maritime Council.

EXHIBIT 4



**Club Letter of Undertaking**

To: Cargo Interests, including but not limited to:
M/s Breffka & Hehnke of Dusseldorf, Germany
for and on behalf of Kurt Orban Partners and Cargo Insurers
c/o Clyde & Co LLP
51 Eastcheap, LONDON EC3M 1JP
United Kingdom

Ship: M/V ALAM MAKMUR

Voyage: V. MAK001 from Shanghai to Houston

Cargo: Carbon steel Pipes

Bill of lading: DWLGMAKHOU70090

Description of claim: Alleged damage of carbon steel pipes

Amount of undertaking:
In figures: USD50,000.00
In words: Fifity thousand dollars

Date of incident: 10th May 2007

Date of letter of undertaking: 16th May 2007

In consideration of and upon condition that you refrain from arresting or otherwise detaining the
above vessel or any other vessel or property in the same legal beneficial or associated
ownership or management in connection with the above alleged claim and/or prosecuting legal or
arbitration proceedings in respect of such claim, otherwise than before a court or tribunal of
competent jurisdiction, against the owners of the above vessel, their servants or agents in
connection with the said claim,

WE HEREBY UNDERTAKE to pay to you within 28 days of receipt of written demand from you
any sum together with interest and costs not exceeding the amount mentioned above, which is
either agreed in writing between us and the owners of the above vessel and yourselves to be due
to you in respect of the claim or for which the owners are held liable by means of a final
enforceable and unappealable arbitration award or a final enforceable and unappealable
judgment of a court or tribunal of competent jurisdiction.

This undertaking is given without prejudice to all rights and defences which may be available to
owners and/or any rights of limitation of liability according to international conventions or local
laws.

This undertaking shall be subject to English law and jurisdiction of the High Court of Justice in
London and will expire if legal proceedings have not been commenced before a court or tribunal
of competent jurisdiction within one year from the date of this letter of undertaking.



Yours faithfully,
for and on behalf of
Assuranceforeningen SKULD (Gjensidig)


Chris Hall
Vice President
Head of Singapore Representative Office
Dir line: +65 6491 1126
Phone: +65 6491 1125
Mobile: +65 9823 1328
E-mail: sng@skuld.com

